UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LINDA RILEY and JAMES RILEY,

                Plaintiffs,

      v.

MARRIOTT INTERNATIONAL, INC.,

               Defendant.

_____

                      <u>DECISION & ORDER</u>

                      12-CV-6242P

## PRELIMINARY STATEMENT

        Linda Riley and James Riley (collectively, the "Rileys") have commenced this action against Marriott International, Inc. ("Marriott") asserting state law claims for negligence arising from a slip and fall accident suffered by Linda Riley at a Marriott hotel in Lahaina, Hawaii on January 10, 2011. (Docket # 1-1 at 5-6). Federal jurisdiction is based upon the diversity of citizenship of the parties, 28 U.S.C. § 1441. (Docket # 1).

        Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment. (Docket # 35). Currently before the Court is the Rileys' motion for summary judgment. (Docket # 31). In the motion, the Rileys also seek sanctions for Marriott's alleged spoliation of relevant evidence. (*Id.*). For the reasons discussed below, the Rileys' motion is granted in part and denied in part.

## I.     <u>Motion for Sanctions</u>

### A.     <u>Factual Background</u>

The Rileys' claims arise from Linda Riley's slip and fall accident that occurred at Marriott's Maui Ocean Club hotel (the "Hotel") located at 100 Nohea Kai Drive, Lahaina, Hawaii.  (Docket # 1-1 at 5, ¶ 4).  According to Linda Riley ("Linda"), she slipped and fell on the floor of the Hotel's parking garage after exiting an elevator.  (Docket # 31-1 at ¶ 4).  The Rileys contend that the floor was wet from rainwater that had been permitted to pool.  (*Id.* at ¶¶ 4, 9).  According to the Rileys, Marriott failed to take reasonable precautions to prevent her fall by removing the accumulated water, providing a non-slip surface or providing warning signs. (Docket # 31-11 at 2-4).

The Rileys maintain that Marriott had a surveillance camera that monitored and recorded the area of Linda's accident twenty-four hours a day.  (Docket ## 31-11 at 9; 33-4 at 21).  Robert Romero ("Romero"), the loss prevention manager at the Hotel, testified that the area of Linda's accident is recorded continuously throughout the day and the recording is stored on a hard drive.  (Docket # 33-4 at 6, 8, 21).  The recordings are maintained for thirty days, at which time the stored recordings are overwritten by new recordings.  (*Id.* at 8).  According to Romero, once he is notified of a potential claim against the Hotel, he is responsible for preserving information relating to that claim.  (*Id.* at 10-11).

Romero testified that he reviewed the security footage from the camera monitoring the area of Linda's fall after he learned of the accident.  (*Id.* at 9, 11-12).  According to Romero, the video showed Linda's fall, her removal from the scene in a wheelchair, and hotel employees placing wet floor signs and sweeping up the water on the floor.  (*Id.* at 12-14). Romero also testified that because the camera records continuously throughout the day, the

recording also depicted the area of Linda's accident prior to her accident.  (*Id.* at 20-21).

Romero turned the recording over to the Hotel's liability insurance carrier.  (*Id.* at 11-13).

The Rileys maintain that Marriott failed to provide them with complete relevant footage recorded on the surveillance camera.  (Docket ## 31-1 at ¶ 28; 31-11 at 9).  According to the Rileys, Marriott has provided only approximately seven minutes of the footage, which begins about one minute before Linda's accident and ends before she is removed from the ground and placed in a wheelchair.  (*Id.*; Docket # 33, Exhibit ("Ex.") E (DVD Recording of January 10, 2011, Manually Filed with the Court)).  The Rileys maintain that Marriott had a duty to preserve more of the footage both prior and subsequent to Linda's accident.  (Docket ## 31-1 at ¶¶ 26-35; 31-11 at 9).

The Rileys contend that footage before the accident would be important to demonstrate the condition of the floor during the time preceding the accident, allowing them to establish when the water collected on the floor and how long the water was there before Linda's accident.  (Docket # 34 at ¶¶ 15-17).  In addition, the footage would reveal whether hotel employees had monitored the area or observed the wet floor conditions.  (*Id.* at ¶¶ 13-17).  For example, Robert Burger, the security supervisor at the Hotel, testified that he had walked through the area of the fall approximately forty-five minutes prior to the accident.  (Docket ## 34 at ¶ 14; 33-3 at 5, 23).  According to the Rileys, they are unable to meaningfully challenge his testimony because the footage that would have verified whether or not Burger had walked through the area has been destroyed.  (Docket # 34 at ¶¶ 15, 24).

Similarly, the Rileys maintain that footage of the scene after the accident would also be relevant to demonstrate how much water had collected on the floor.  (*Id.* at ¶¶ 17-19).  According to the Rileys, Romero testified that the video he viewed depicted hotel staff placing

wet floor signs and removing the water from the floor after the accident.  (*Id.*).  The recording, however, ends just as a hotel employee is observed entering the area with a sign and a broom.  (Docket # 33, Ex. E).  Thus, the Rileys are unable to determine how much water was removed from the location and how long it took the hotel staff to remove it.  (Docket # 34 at ¶¶ 18-19).

In addition, the Rileys contend that the Hotel had a policy of maintaining "sweep sheets" or maintenance logs.  (Docket ## 31-1 at ¶ 31).  In support of this contention, the Rileys have provided a Marriott document that appears to set forth standards applicable to sweep logs (the "sweep log policy").  (Docket # 31-9 at 4).  The purpose of the sweep log policy is to "ensure that floor cleaning is performed as scheduled, as well as, to provide a record of work completed in the event of accident claims due to wet or littered floors."  (*Id.*).  The sweep log policy requires that the logs contain the following information:  (1) location; (2) date; (3) time cleaning started; (4) time cleaning ended; and, (5) name of associate completing that cleaning.  (*Id.*).  The policy requires that sweep logs be completed daily and be maintained for three months.  (*Id.*).  It also requires that all public areas be vacuumed or mopped every day "or more frequently as traffic volume dictates."  (*Id.*).  The Rileys maintain that the sweep sheets would be relevant in determining issues of Marriott's notice of the condition of the floor, its duty to warn and its duty to correct the condition.  (Docket # 34 at ¶ 23).  According to the Rileys, the sweep sheets for January 2011 were destroyed by Marriott.  (*Id.* at ¶ 22).

Marriott opposes the motion for sanctions solely on the grounds that the Rileys have failed to demonstrate prejudice resulting from the destruction of the sweep logs and portions of the video footage.  (Docket ## 33 at ¶ 43; 33-5 at 7-10).  Marriott does not dispute that the sweep logs and video footage existed or that it had a duty to preserve them.  (*Id.*).  Nor does Marriott offer any justification for or explanation of their destruction.  (*Id.*).  According to

Marriott, the only portion of the video that was not produced is the footage of Linda being placed in a wheelchair and removed from the scene.  (Docket # 33-5 at 9).  Marriott contends that this footage is not relevant to the Rileys' claim and they thus have not been prejudiced by the destruction of the footage.  (*Id.*).

B.   **Discussion**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[1] *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'"  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), *abrogated on other grounds by*, *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1724 (2013); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)); *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("[w]hether exercising its inherent power or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses"), *cert. denied*, 528 U.S. 1119 (2000).

---

[1]  The parties rely upon Hawaii state law in support of their spoliation argument in their memoranda of law. (Docket ## 31-11; 33-5).  During oral argument, the Court informed the parties that it would resolve the spoliation issues under applicable federal law.  *See Steinsnyder v. United States*, 2013 WL 1206451, *13 (E.D.N.Y.) ("[t]he Court's own research reveals that, in . . . diversity actions, courts routinely apply federal law to motions for spoliation sanctions") (citing *Farella v. City of New York*, 323 F. App'x 13, 15 (2d Cir. 2009)), *report and recommendation adopted as modified*, 2013 WL 1209099 (E.D.N.Y. 2013); *Schwarz v. FedEx Kinko's Office*, 2009 WL 3459217, *6 n.4 (S.D.N.Y. 2009) ("[i]n a diversity case, federal law, not state law, governs the Court's imposition of spoliation sanctions[;] [a] federal court's authority to impose sanctions . . . derives not from substantive law, but rather from its inherent power to control the judicial process").

A party bringing a spoliation motion must demonstrate that:  (1) the party charged with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with a "culpable state of mind"; and, (3) the destroyed evidence was relevant to the party's claim or defense.  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001)); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

### 1.     Duty to Preserve

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?"  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 216 (emphasis in original).  A party is obligated to preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002).  Once the duty to preserve has attached, a party should institute a litigation hold and "suspend its routine document and retention/destruction policy."  *Toussie v. Cnty. of Suffolk*, 2007 WL 4565160, *7 (E.D.N.Y. 2007) (quoting *Zubulake*, 220 F.R.D. at 218).  As discussed above, Marriott has not challenged the Rileys' contention that it had a duty to preserve the destroyed evidence.  In any event, Romero testified that he was aware of his obligation to preserve evidence in the possession of the Hotel when a guest had an accident and that he became aware of Linda's accident the day after it occurred.  (Docket # 33-4 at 10-11).  Further, no genuine question exists that video footage depicting the scene of an accident and sweep logs reflecting maintenance performed at the scene

of an accident is likely to contain relevant information.  Accordingly, I easily conclude that

Marriott had a duty to preserve both the sweep logs and the video footage from the day of the

accident.  *Slovin v. Target Corp.*, 2013 WL 840865, *3 (S.D.N.Y. 2013) (obligation to preserve

video footage of slip-and-fall accident arose at the time of the accident; "[defendant] had the

duty to preserve an unedited version of the video, one that is continuous and certainly longer

than two minutes, because the video would have shown the events leading up to and following

[plaintiff's] accident, which might have been relevant").

      2.     **<u>Culpability</u>**

"[A] finding of bad faith or intentional misconduct is not a *sine qua non* to

sanctioning a spoliator."  *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d at 268.  Rather, a finding of

gross negligence will satisfy the "culpable state of mind" requirement, as will knowing or

negligent destruction of evidence.  *Id.*; *Residential Funding Corp.*, 306 F.3d at 108 ("[t]he

sanction of an adverse inference may be appropriate in some cases involving the negligent

destruction of evidence because each party should bear the risk of its own negligence");

*Zubulake*, 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference

includes ordinary negligence").

      When the duty to preserve arises, the failure to institute a litigation hold or

suspend document destruction practices does not constitute *per se* gross negligence.  *Chin v. Port

Auth. of New York & New Jersey*, 685 F.3d at 162.  Instead, "the better approach is to consider

[the failure to adopt good preservation practices] as one factor in the determination of whether

discovery sanctions should issue."  *Id.* (internal quotation omitted) (alteration in original); *see

GenOn Mid-Atlantic, LLC*, 282 F.R.D. 346, 357 (S.D.N.Y. 2012) (categorical approach is

inappropriate because circumstances of case may warrant finding of negligence rather than gross negligence).

Here, Marriott has failed to offer any justification for its failure to preserve the evidence.  Indeed, in its papers opposing the motion, Marriott failed to offer any facts concerning how or why the evidence was destroyed.  During oral argument, the Court asked counsel for Marriott to explain the circumstances under which the materials were destroyed.  Counsel for Marriott conveyed his belief that the sweep logs were destroyed in accordance with routine document destruction policy.  He was unable to provide an explanation for the destruction of portions of the video footage.

Although facing a serious motion for sanctions with potentially significant consequences, Marriott apparently did not investigate the destruction of the relevant evidence or, if it did, explain the results of the investigation.  Thus, the only information that this Court has concerning the destruction of the evidence are the assertions of Marriott's counsel made during oral argument.  Even then, Marriott's counsel was unable to provide any facts concerning the circumstances under which the video footage was destroyed.  The failure to provide the Court with any sworn facts from persons with knowledge of the destruction of the challenged evidence demonstrates such a lack of diligence that it suggests bad faith destruction.  In any event, Marriott's failure to preserve the entire video footage relating to Linda's accident and the sweep logs for the day in question despite the Hotel's loss prevention employee's testimony that he knew that he had a duty to preserve relevant evidence constitutes, at a minimum, gross negligence. *See Slovin v. Target Corp.*, 2013 WL 840865 at *5 (citing *Zubulake*, 220 F.R.D. 221 (finding gross negligence for permitting routine recycling of tapes after being "*unquestionably on notice of its duty to preserve*") and *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 380

(D. Conn. 2007) (finding gross negligence where there was "no evidence that the defendants did anything to stop the routine destruction of the backup tapes after [their] obligation to preserve arose")).

### 3.    <u>Appropriate Sanctions</u>

Under Rule 37 of the Federal Rules of Civil Procedure, courts have broad discretion to sanction a party for failing to produce or destroying relevant and discoverable evidence. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (discussing court's authority to impose sanctions under Fed. R. Civ. P. 37 where party destroys evidence in violation of court order or under court's inherent power in absence of court order); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d at 436; *Residential Funding Corp.*, 306 F.3d 99 at 107. Available sanctions include, *inter alia*:  (1) an adverse inference jury instruction; (2) a preclusion order; (3) an order striking all or part of the pleadings; and, (4) an order dismissing all or part of the action. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi); 37(c)(1)(c). In addition to the sanctions set forth under Rule 37(b), Rule 37(c) authorizes sanctions of attorney's fees or notice to the jury of a party's failure to provide information. Fed. R. Civ. P. 37(c)(1).

Although a finding that the moving party has been prejudiced is not a prerequisite to the imposition of sanctions, *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 212 F.R.D. 178, 229 (S.D.N.Y. 2003), *adhered to on reconsideration by*, 2004 WL 1943099 (S.D.N.Y. 2004), before awarding "'more severe sanctions – such as dismissal, preclusion, or the imposition of an adverse inference – the court must consider . . . whether the innocent party has suffered prejudice as a result of the loss of [relevant] evidence.'" *Williams v. New York City Transit Auth.*, 2011 WL 5024280, *8 (E.D.N.Y. 2011) (quoting *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at

467).  Proof of prejudice in this context refers to evidence from which a "reasonable trier of fact could infer that the . . . unavailable evidence would have been of the nature alleged by the party affected by its destruction."  *See Residential Funding Corp.*, 306 F.3d at 109; *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 178 (E.D.N.Y. 2009) ("where more severe sanctions are at issue[,] . . . the moving party must show that the lost information would have been favorable to it") (quoting *Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, *7 (S.D.N.Y. 2005).  When conducting this analysis, "[c]ourts must take care to not hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence, because doing so would subvert the … purposes of the adverse inference, and would allow parties who have … destroyed evidence to profit from that destruction."  *Residential Funding Corp.*, 306 F.3d at 109 (internal quotations omitted).  Where the evidence has been destroyed or lost through bad faith or "egregious" gross negligence, an inference may be drawn that the missing evidence was unfavorable to the culpable party.  *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438-39 (S.D.N.Y. 2010) (citing *Residential Funding Corp.*, 306 F.3d at 109; other citations omitted).

I easily conclude that the Rileys have demonstrated that the destruction of the sweep logs and the video footage prejudiced them.  As an initial matter, I find that Marriott's failure to explain the circumstances of the destruction of the evidence supports a finding that the evidence was destroyed through gross negligence, thus permitting an inference that the missing evidence was unfavorable to Marriott.  *See Slovin*, 2013 WL 840865 at *6 (defendant's act of editing video footage of accident, using footage as settlement leverage and failing to explain why it decided to preserve only a 41-second clip of the accident supported finding that video footage

was relevant as a matter of law; "[defendant's] behavior throughout, from the record before me, was shocking, and sanctions are appropriate").

In any event, I agree with the Rileys that the video footage both prior and subsequent to Linda's accident would be relevant to demonstrate the conditions of the floor, how long those conditions persisted and whether Marriott employees had actual or constructive notice of the conditions. Similarly, the sweep logs could demonstrate whether and when Marriott employees had been in the vicinity of the accident on the day in question, which would also be relevant to the issues of actual or constructive notice. Of course, the precise contents of the destroyed evidence will never be known to the Rileys or the Court. Under such circumstances, a finding of prejudice is warranted. *Rodgers v. Rose Party Functions Corp.*, 2013 WL 6002375, *4 (E.D.N.Y. 2013) (video footage of plaintiff's accident could have shown the condition of the stairs, whether they were wet and whether defendant's employees had cleaned them or observed their condition; "bearing in mind the concern expressed by the Second Circuit . . . that plaintiffs not be held to too high a burden of proof, I conclude that the video recording destroyed by defendants would have been relevant, and that sanctions are therefore warranted"); *Essenter v. Cumberland Farms, Inc.*, 2011 WL 124505, *7 (N.D.N.Y. 2011) (plaintiff provided evidence of weather conditions on the day of the accident that tended to show that the video footage would have been favorable; "it is clear that a video showing the time before, during, and after an incident is relevant to determine what actually happened at the moment the injury occurred"); *Disler v. Target Corp.*, 2005 WL 2127813, *27 (E.D. Tenn. 2005) (contents of destroyed footage, although unknown, was relevant to plaintiff's claims and could have supported her version of events; plaintiff was thus prejudiced by its destruction); *Klezmer ex rel. Desyatnik v. Buynak*, 227 F.R.D. 43, 50-51 (E.D.N.Y. 2005) (maintenance log for day of accident was

relevant to the condition of the vehicle on the day of the accident and defendant's knowledge of the condition, and plaintiff was prejudiced by its destruction).

As with many fact-bound determinations, "[t]he determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd.*, 247 F.3d at 436 (internal citation omitted). As the Second Circuit has observed:

> [T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the doctrine. The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*West*, 167 F.3d at 779 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)) (internal quotation and citation omitted).

The Rileys' submissions do not identify the precise sanction they seek. Rather, they request that the Court "remedy the injustice caused by defendants by ruling the evidence in [p]laintiffs' favor and by granting summary judgment." (Docket # 31-1 at ¶ 34). The Court interprets this request to seek the striking of Marriott's answer, or in the alternative, an adverse inference instruction.

"Dismissal of a lawsuit, or its analogue, striking an answer, is appropriate if 'there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party;' however, because it is a 'drastic remedy ... it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'" *Occhino v. Citigroup Inc.*, 2005 WL 2076588, *11 (E.D.N.Y. 2005) (quoting *West*, 167 F.3d at 789-90). Similarly, an adverse inference is a severe sanction that should be reserved for egregious conduct or for situations in

which the loss of relevant evidence has so prejudiced the moving party that preclusion or an adverse inference is necessary to restore the moving party to its pre-loss position. *See*, *e.g.*, *Residential Funding Corp.*, 306 F.3d at 112 (instructing district court on remand to consider monetary sanctions in lieu of adverse inference instruction if no prejudice is found); *Toussie v. Cnty. of Suffolk*, 2007 WL 4565160 at *9 (declining to order adverse inference instruction where the movant had "not sufficiently demonstrated that the destroyed/lost emails were favorable" to its case); *De Espana v. Am. Bureau of Shipping*, 2007 WL 1686327, *8 (S.D.N.Y. 2007) (same).

I find that the striking of Marriott's answer is too drastic a remedy under the circumstances of this case and conclude that an adverse inference instruction is both appropriate and sufficient to deter Marriott from similar future conduct, to shift the risk of an erroneous judgment to Marriott and to restore the Rileys' position in this litigation. *See Slovin*, 2013 WL 840865 at *6 (declining to strike answer, but ordering adverse inference instruction as sanction for defendant's destruction of video footage depicting plaintiff's accident); *Rodgers v. Rose Party Functions Corp.*, 2013 WL 6002375 at *4 ("an adverse inference instruction advising the jurors that they may infer that the video recording would have corroborated plaintiff's allegations and rebutted defendant's assertions will suffice to restore plaintiff to the position she would have been in had the recording been preserved"); *Kravtsov v. Town of Greenburgh*, 2012 WL 2719663, *6 (S.D.N.Y. 2012) (declining to impose default judgment and preclusion sanctions for defendant's destruction of video footage; "adverse inference instruction . . . is appropriate here[;] [i]t will deter [d]efendants and their attorney from engaging in or allowing spoliation of evidence, . . . it places the risk of an erroneous judgment on [d]efendants . . . [and] [i]t will also restore [p]laintiff to the position he would have been in absent the destruction of the video"); *Essenter v. Cumberland Farms, Inc.*, 2011 WL 124505 at *7 ("the Court finds that [p]laintiffs

are entitled to an adverse inference permitting the jury to infer that the missing videotape was unfavorable to [d]efendant").  The adverse inference will permit, but not require, the factfinder to infer that the missing video footage would have been favorable to the Rileys and unfavorable to Marriott.  *See DeMeo v. Tucker*, 509 F. App'x 16, 19 (2d Cir. 2013) (rejecting plaintiff's contention that adverse inference should have been mandated rather than simply permitted where relevant evidence had been lost or destroyed; "courts have 'wide discretion' in formulating sanctions") (quoting *Reilly*, 181 F.3d at 267).


## II.   <u>Rileys' Motion for Summary Judgment</u>

The Rileys seek partial summary judgment in their favor on the issue of liability. (Docket # 31).  Conceding that issues of negligence and proximate cause are typically issues for the jury, the Rileys nevertheless contend that no issues of fact exist in this case precluding the Court from awarding judgment in their favor on the issue of liability.  (Docket # 31-11 at 2). According to the Rileys, no question exists that Marriott owed them a duty to take reasonable precautions to protect them from unreasonable risk of physical injury.  (*Id.* at 6).  The Rileys maintain that the undisputed evidence demonstrates that it was raining on the day of the accident, the area of the accident was covered in water, and Marriott did not remove the water or warn the Rileys of the condition.  (*Id.* at 7-8).  In addition, the Rileys maintain that there is no issue of fact that Linda's injuries were caused by her fall.  (*Id.* at 10-11).  Finally, they argue that even if disputes of fact existed as to the conditions, they are nevertheless entitled to judgment on liability because Marriott destroyed evidence that would have demonstrated both the nature of the conditions and whether Marriott had knowledge of those conditions.  (*Id.* at 8-9).

Marriott counters that genuine issues of material fact preclude summary judgment. (Docket # 33-5). Marriott concedes that it was obligated to take reasonable measures to protect the Rileys from unreasonable risks on its property, but maintains that issues of fact exist concerning whether Marriott breached that duty. (*Id.* at 4-5). According to Marriott, there are fact issues concerning the amount of water that was on the floor, the length of time that it had been on the floor prior to the accident, and whether Marriott had knowledge of it. (*Id.* at 6). In addition, Marriott contends that Linda's comparative negligence must be considered and precludes summary resolution of liability issues. (*Id.* at 7). Marriott does not address the Rileys' contention that no issues of fact exist as to whether Linda's fall caused her injuries.

### A.    Factual Background

Neither party has complied with this district's Local Rules requiring the movant to submit a statement of material facts and the opposing party to submit an opposing statement of facts. *See* W.D.N.Y. Local Rule 56(a)(1)-(2). The parties' failures complicate this Court's review and resolution of the pending motion by requiring the Court to comb the evidence submitted by the parties to identify the relevant facts. Thus, the facts recited herein are taken from the deposition testimony and other exhibits submitted by the parties.

### 1.    Rileys' Testimony

Linda testified that it was raining when she awoke on the morning of her accident. (Docket # 31-2 at 5) The Rileys ate breakfast in their room and then decided to drive to the other side of the island in the hopes that the weather would be better in that area. (*Id.* at 6). They left the Hotel around lunchtime and drove to Makena Beach, approximately forty-five minutes away. (*Id.*). It was raining there too, and the Rileys stayed at the beach for approximately forty minutes

before traveling back to the Hotel.  (*Id.* at 7).  They arrived at that Hotel at about 4:00 p.m. and parked their rental car in the parking garage at the Hotel.  (*Id.*).

According to Linda, it was still raining outside and the wind was blowing.  (*Id.*). Linda and her husband entered the elevator attached to the parking garage in order to descend to the main floor.  (*Id.*).  Linda testified that her husband exited the elevator first and she followed. (*Id.* at 7-8).  According to Linda, she took one step out of the elevator and immediately slipped, falling to the ground.  (*Id.*).  Linda immediately felt a sharp pain in her right ankle and calf.  (*Id.* at 9).  At the time of the accident, Linda was wearing shorts, a top and a pair of flip-flops.  (*Id.* at 7-9).

Linda testified that she did not notice any water in the elevator before she exited. (*Id.* at 8).  According to Linda, she did not look at the floor outside the elevator before stepping out and did not see the water on the floor before she fell.  (*Id.* at 10).  Linda testified that she did not notice the water until she was already on the ground and the water began soaking her shorts. (*Id.*).  While seated on the ground, Linda did not observe any warning or wet floor signs.  (*Id.*). Linda testified that it was still raining and windy at the time of her accident.  (*Id.*).  Prior to the accident, Linda had used the elevator approximately fifty times and had never observed standing water in the parking garage.  (*Id.* at 11).

After the accident, Marriott staff, including housekeeping and security staff, came to assist the Rileys.  (*Id.* at 9).  Linda was unable to stand, and the Hotel staff brought her a wheelchair and icepack.  (*Id.* at 10).  Shortly thereafter, the Rileys sought medical treatment for Linda's injuries.  (*Id.* at 14).  They met with Dr. Estin at the Doctors on Call located in a neighboring hotel.  (*Id.* at 11, 14).  Estin x-rayed Linda's ankle, wrapped it in an Ace bandage, and provided her crutches and pain medication.  (*Id.* at 14).  Approximately three days later, the

Rileys returned to the Doctors on Call and met with Dr. Liu because Linda began experiencing tingling and numbness in her leg.  (*Id.* at 15).  Linda underwent an ultrasound and a further x-ray.  (*Id.*).  The x-ray revealed a spiral fracture of her fibula.  (*Id.*).  Liu fitted Linda with a knee immobilizer to permit her to travel home to Rochester, New York.  (*Id.* at 15-16).  Once she returned home, Linda met with her doctor's assistant, who confirmed the fracture, fitted Linda with a boot and recommended physical therapy.  (*Id.* at 16).

According to Linda, continued tingling and numbness caused her doctor, Dr. Stefanich ("Stefanich"), to refer her to Dr. Alaimo ("Alaimo"), a neurologist.  (*Id.* at 17-18).  According to Linda, Alaimo performed a nerve induction on her leg and determined that she had suffered nerve damage.  (*Id.* at 18).  Linda returned to Stefanich, who opined that the nerve damage was permanent.  (*Id.* at 19).

The testimony of Linda's husband ("James") was generally consistent with hers.  (Docket # 31-3).  He testified that the couple previously had been to the Hotel on six or seven different occasions.  (*Id.* at 3).  The weather was rainy and windy the morning of the accident.  (*Id.*).  According to James, the couple returned to the Hotel from Makena Beach at approximately 4:00 p.m.  (*Id.*).  They entered the elevator to descend to the main level.  (*Id.* at 3-4).  James testified that he exited the elevator first and, after taking approximately four steps, heard a commotion from behind.  (*Id.* at 4).  He turned and observed Linda on the ground with her right leg underneath her.  (*Id.*).  According to James, his wife appeared to be in pain and was unable to stand.  (*Id.*).

James testified that when he exited the elevator, he did not notice any warning signs and did not notice the condition of the floor.  (*Id.*).  After exiting, he noticed that water had accumulated on the floor and that the cement flooring was very smooth.  (*Id.* at 4-5).  At the time

17

of Linda's accident, James testified, it was still raining and windy.  (*Id.* at 4).  Marriott

employees responded to the scene to assist them.  (*Id.*).  According to James, the staff arranged

for a wheelchair.  (*Id.* at 4-5).  In addition, an employee arrived with a broom and began

sweeping the water off of the cement surface.  (*Id.* at 5).

### 2.   **Marriott Employees' Testimony**

Reyma Alejandro ("Alejandro") testified that she was employed as a housekeeper

and had just ended her shift when she observed Linda fall.  (Docket # 33-2 at 8-10).  According

to Alejandro, the weather that day was cloudy and it "drizzled" for part of the day.  (*Id.* at

10-11).  Alejandro testified that she observed Linda take one step out of the elevator and then

slip and fall.  (*Id.* at 11).  According to Alejandro, the floor was a "little" wet from the rain, but

wasn't "that wet."  (*Id.* at 12).  After witnessing the fall, Alejandro asked Linda if she was all

right and told her co-worker to call loss prevention.  (*Id.* at 12-13).  Alejandro waited with the

Rileys until security personnel arrived, at which point she left the scene.  (*Id.* at 13-14).

Robert Burger (Burger") was the security supervisor on duty at the time of

Linda's accident on January 10, 2011.  (Docket # 33-3 at 5-6).  According to Burger, his

responsibilities included patrolling the grounds for safety, responding to first aid calls and

managing property that was lost and found.  (*Id.* at 7).  Burger testified that he had received

training in first aid, CPR and security responsibilities, including how to patrol the grounds for

safety hazards.  (*Id.* at 8).  According to Burger, he had been trained when observing slippery

surfaces to immediately notify housekeeping to clean liquids collected on walking surfaces.

(*Id.*).

Burger responded to a first aid call at the Hotel in January 2011.  (*Id.* at 9-10).

According to Burger, when he arrived at the accident scene, he observed Linda sitting on the

floor just outside of the elevator.  (*Id.*).  Burger did not observe any cones or wet floor signs.  (*Id.* at 13-14).  Burger testified that it was rainy and windy and the floor was wet when he arrived. (*Id.* at 10).  Linda told Burger that she had slipped and fallen after stepping out of the elevator and that she was unable to stand.  (*Id.* at 11).  Burger noticed that Linda was wearing rubber "slippers" that had a strap on the front but no strap on the back.  (*Id.* at 12).

Burger testified that he arranged for a wheelchair and icepack and informed the Rileys that there was a doctor's office nearby.  (*Id.* at 11).  Burger also called housekeeping and instructed them to clean the floor and to place wet floor signs in the area of the accident.  (*Id.* at 14-15).

Although Burger did not generally recall the weather earlier in the day, he did recall that a significant and sudden "downpour" occurred at approximately 4:00 p.m. that day. (*Id.* at 13).  Wind accompanied the downpour, according to Burger.  (*Id.*).  Burger testified that the wind was blowing the rain onto the floor where Linda fell and that he observed approximately one-eighth of an inch of water on the floor.  (*Id.*).  According to Burger, the water appeared to be rainwater that had been blown by the wind.  (*Id.* at 15).  The floor area, Burger testified, consisted of bare concrete and had a smooth finish.  (*Id.* at 21).  According to Burger, he checked the surface of the floor and did not consider it to be slippery.  (*Id.* at 22-23).  At the time, he was wearing shoes with non-slip soles.  (*Id.*).

Burger considered the area where the accident occurred to be in a safe condition and previously had never observed water in the area.  (*Id.* at 21-22).  According to Burger, the day of Linda's fall was the first time that he had ever observed windblown rain on that area of the floor.  (*Id.*).  Burger testified that he typically traverses that area approximately four times each shift and had never before observed the floor to be wet during rainy weather conditions.

(*Id.* at 22).  According to Burger, he had walked through that area approximately forty-five minutes before the accident.  (*Id.* at 23).

Romero, the Hotel's security director, testified that he is responsible for training security and housekeeping staff on the proper response to dangerous or wet floor conditions. (Docket # 33-4 at 16-17).  According to Romero, all Hotel associates attend a monthly training session for prevention of slips, trips and falls.  (*Id.* at 18).  Romero testified that all Hotel staff are trained to call housekeeping immediately if they observe wet conditions on the floor.  (*Id.*).

Romero testified that the Hotel staff also receives weather-hazard training.  (*Id.* at 19).  According to Romero, there are particular areas throughout the Hotel that the staff are trained to monitor during stormy conditions.  (*Id.*).  If any member of the staff identifies accumulating water, they are instructed to remove the water immediately and place wet floor signs.  (*Id.* at 19, 30-31).  According to Romero, the area where Linda fell was not an area that was routinely patrolled during rainy weather.  (*Id.* at 19).  Romero testified that he was not aware of water accumulating in that area prior to Linda's accident.  (*Id.* at 19-20).  Indeed, Romero testified, he was not aware of any drainage problems in that area prior to Linda's fall.  (*Id.* at 29).

Patricio Nava ("Nava"), the Director of Services at the Hotel, testified that Hotel staff was trained to monitor ground conditions at the Hotel during inclement weather.  (Docket ## 31-1 at ¶ 20; 31-7 at 2).  During very heavy rains, Nava testified, Hotel staff might use sand bags to absorb accumulated rainwater.  (Docket # 37-1 at 2).  According to Nava, Hotel staff are directed to walk the grounds of the Hotel to check for any areas of accumulated water.  (*Id.* at 2). Nava testified that one of the areas that is monitored is the area outside of the elevator where Linda fell.  (*Id.* at 4).

According to Nava, the floor in the area where Linda fell is pitched towards the elevators so that rainwater runs down the sidewalk towards the elevators.  (*Id.* at 3).  Nava testified that he observed the video footage of Linda's accident and could tell that the floor was wet.  (*Id.* at 5).  According to Nava, the floor in that area would be slippery under those conditions.  (*Id.* at 6).

Janelito Corpuz ("Corpuz"), the Hotel's assistant chief engineer, testified that his duties included overseeing the maintenance of the Hotel property and grounds, including painting, plumbing and maintenance of appliances, fixtures and laundry equipment.  (Docket # 31-4 at 5-8).  Corpuz was also responsible for maintaining the Hotel walkways and ensuring that they were not slippery, cracked or obstructed.  (*Id.* at 8).  Corpuz testified that the Hotel walkways are made of concrete, flagstone or slate and are pre-texturized, ensuring a non-slip surface.  (*Id.* at 8-9).

According to Corpuz, after Linda's accident, the floor where she fell was painted with an epoxy-based flooring paint containing silicon substrate sand.  (*Id.* at 12-14).  The paint, Corpuz testified, supplemented the original substrate of the floor, which contained salt to make the surface gritty.  (*Id.* at 12, 15).  According to Corpuz, the floor was painted because "someone" had fallen in that area.  (*Id.* at 14).

Corpuz testified that he was unaware of any other accidents in the same area, although he was aware that water had accumulated in that area on prior occasions during heavy rains.  (*Id.* at 15-17).  According to Corpuz, when that happened, water tubes would be used to remove the excess water and wet floor signs or cones would be placed on the floor in the area.  (*Id.* at 17-18).  Corpuz testified that such measures were necessary only during "heavy, heavy storms."  (*Id.*).  Corpuz also testified that housekeeping staff often used squeegees or brooms to

remove excess water and he never observed a mat placed in the area where Linda fell.  (*Id.* at 19-20).

Corpuz viewed the video footage of Linda's accident.  (*Id.* at 20).  He testified that he could not determine from viewing the video whether the surface of the floor was slippery.  (*Id.* at 15).  Nor could he determine the amount of water on the floor or whether it had rained heavily or lightly on the day of the accident.  (*Id.* at 19).  According to Corpuz, the conditions depicted in the video footage would have warranted wet floor cones.  (*Id.* at 20).

### 3.     <u>Opinion from Independent Medical Examiner</u>

At the request of Marriott's counsel, Linda was examined by Louis Medved ("Medved"), MD, an independent neurologist, on July 9, 2013.  (Docket # 31-10 at 8-9).  Medved interviewed her to learn about her accident and the treatment she had received in Hawaii and Rochester.  (*Id.* at 9-10).  According to Medved's report, Linda was treated by Stefanich, her orthopedist, and also by Alaimo, her neurologist.  (*Id.*).  According to Medved, Alaimo conducted electrodiagnostic studies, which confirmed that Linda had a peroneal nerve injury.  (*Id.*).  Linda reportedly continued to experience symptoms from the nerve injury, including pressure sensation in her large toe and numbness in her right foot, and cramping, diminished toe mobility and throbbing in her foot.  (*Id.* at 10).

Upon examination, Medved noted mild weakness in her right anterior tibialis and extensor hallicus longus muscles, accompanied by some fatigue and giveaway.  (*Id.*).  Medved noted normal strength in her right posterior tibialis and peroneus muscles, as well as in her proximal muscles of her lower right extremity.  (*Id.*).  In addition, he noted that Linda was able to rise on her heels, although she had a partial foot drop, and had no difficulty rising on her toes, although she did have a slight steppage gait.  (*Id.*).  Upon sensory examination, Linda expressed

diminished pin and light touch in the dorsal aspect of her right foot and toes, and Tinel's was

positive over her right fibular head.  (*Id.*).

Medved reviewed Linda's medical history, her responses to discovery demands,

and the transcripts of depositions of Linda and James.  (*Id.* at 12).  Medved also reviewed images

of Linda's right tibia and fibula, and the x-rays taken while the Rileys were in Hawaii.  (*Id.*).

Medved concurred with the radiologist's interpretation that Linda had suffered a proximal right

fibular fracture.  (*Id.*).

Medved opined that Linda suffered from right peroneal neuropathy involving the

deep peroneal nerve and the superficial sensory branch.  (*Id.*).  According to Medved, her

condition developed after her accident at the Hotel.  (*Id.*).  Medved opined that the location of

her nerve injury correlates to the fracture Linda sustained to her fibula.  (*Id.*).  Accordingly,

Medved opined that there is a causal connection between her injuries and the accident at the

Hotel.  (*Id.*).  Medved further opined that Linda continued to suffer from mild sensory motor

deficit and residual weakness in her right foot, along with a partial foot drop with heel walk, and

sensory loss in her peroneal sensory distribution.  (*Id.*).  Accordingly, Medved concurred with

Stefanich's conclusion that Linda's condition was permanent.  (*Id.*).

### 4.    Rileys' Expert Report

The Rileys retained Allan D. Snyder ("Snyder") to provide his opinion concerning

the relevant standard of care and the relevant customs and practices of reasonable and prudent

property owners and managers under the circumstances presented in this case.  (Docket # 31-6 at

17).  Snyder reviewed the complaint, the video recording, the deposition testimony and

discovery.  (*Id.* at 18).  In his report, Snyder recounted the underlying facts of the accident,

including Linda's testimony that it had been raining most of the day and testimony from Marriott

employees that wet floor signs were stored in a location "approximately two minutes walking distance" from the accident site.  (*Id.*).

Snyder opined that Linda was using the walking surfaces of the Hotel in a reasonable and prudent manner consistent with the intended use of the walking surfaces at the Hotel.  (*Id.* at 19).  Snyder further opined that because the area where Linda fell opened to the outside, Marriott knew or should have known that water from rain would accumulate on the walking surface.  (*Id.* at 20).  Further, according to Snyder, it was unreasonable for Marriott to permit water to accumulate on an area that is a known path of travel for its guests.  (*Id.*).  Snyder opined that Marriott failed to increase the slip-resistance of the surface of the floor outside the elevator, did not place non-slip mats outside the elevator and failed to exercise reasonable and prudent care in inspecting and maintaining the area.  (*Id.*).  According to Snyder, non-slip coatings are readily available to reduce the slipperiness of concrete surfaces.  (*Id.*).  Further, Snyder opined that Marriott had a duty to warn its guests of the accumulation of water on the walking surfaces at the Hotel, but failed to place any wet floor signs or cones on the concrete floor outside of the elevator.  (*Id.*).

According to Snyder, Marriott had a duty to its guests to maintain the Hotel in a condition that is safe for its intended use and had a duty to anticipate areas where Hotel guests could be expected to walk.  (*Id.* at 21).  Snyder opined that Marriott breached its duty to the Rileys by failing to remedy a dangerous condition of which it was aware or should have been aware and that the accident likely could have been prevented had Marriott exercised reasonable and prudent care.  (*Id.*).  Snyder opined that the accumulation of water outside of the elevator was the proximate cause of Linda's injury.  (*Id.*).

B.        Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).  A fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

25

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them.  Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution . . . .  [I]t must be kept in mind
> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Under Hawaii law, in order to prevail on a negligence claim, the plaintiff must prove the following:

(1)    A duty, or obligation, recognized by the law, requiring the
[defendant] to conform to a certain standard of conduct, for
the protection of others against unreasonable risks[;]

(2)    A failure on the [defendant's] part to conform to the
standard required: a breach of the duty[;]

(3)    A reasonably close causal connection between the conduct
and the resulting injury[; and]

(4)    Actual loss or damage resulting to the interests of another.

*Knodle v. Waikiki Gateway Hotel, Inc.*, 742 P.2d 377, 383 (Haw. 1987).

Premises owners owe a "duty to use reasonable care for the safety of all persons reasonably anticipated to be upon the premises."  *Pickard v. City & Cnty. of Honolulu*, 452 P.2d 445, 446 (Haw. 1969).  Hawaii law recognizes that a hotel has a special relationship with its guests to protect them from unreasonable risks of physical harm.  *Knodle v. Waikiki Gateway Hotel, Inc.*, 742 P.2d at 384 ("[w]hen the relation is a special one of innkeeper and guest, the former is under a duty to take reasonable action to protect the latter against unreasonable risk of physical harm") (citing *Restatement (Second) of Torts* § 314A (1965)).

This duty requires a hotel owner to take reasonable steps to eliminate, or adequately warn users against, conditions posing an unreasonable risk of harm, if the hotel owner knows or should have known of the unreasonable risk. *See Corbett v. Ass'n of Apartment Owners of Wailua Bayview Apartments*, 772 P.2d 693, 695 (Haw. 1989) ("if a condition exists upon the land which poses an unreasonable risk of harm to persons using the land, then the possessor of the land, if the possessor knows, or should have known of the unreasonable risk, owes a duty to the persons using the land to take reasonable steps to eliminate the unreasonable risk, or adequately warn the users against it"). Thus, in order to be held liable for a dangerous condition, the hotel owner must have "been put on actual or constructive notice of the unsafe condition or defect." *Harris v. State*, 623 P.2d 446, 448 (Haw. Ct. App. 1981).

Both parties agree that Marriott had a duty to use reasonable care to protect the Rileys from unreasonable risks of harm existing on the Hotel property. (Docket ## 33-1 at 6; 33-5 at 4-5). Further, the Rileys seek only partial summary judgment, leaving the issue of damages for the factfinder. (Docket # 31-11 at 6).

### 1. **Breach of Duty**

The issue of whether a duty of care exists is a question of law for the court, although the issue of whether that duty was breached is generally a question for the jury. *Nam Soon Jeon v. 445 Seaside, Inc.*, 2013 WL 431846, *5-6 (D. Haw. 2013). The question of whether a party has breached its duty of care is "bounded by the forseeable range of danger," *id.* at *6 (quoting *Bidar v. Amfac, Inc.*, 669 P.2d 154, 159 (Haw. 1983)), and the question of foreseeability of danger in the context of a breach and the reasonableness of a party's response to that danger are fact questions that generally are not "susceptible of summary judgment." *Id.* (quoting *Henderson v. Prof'l Coatings Corp.,* 819 P.2d 84, 92 (Haw. 1991)). "In other words

'what is reasonable and unreasonable and whether the defendant's conduct was reasonable in the circumstances are for the jury to decide.'" *Id.* (quoting *Knodle*, 742 P.2d at 384).

The Rileys maintain that they have established that Marriott breached its duty of care to the Rileys. According to the Rileys, there is no issue of fact that the floor was wet from rainwater because all of the witnesses testified that the floor was wet and the video footage demonstrates that the floor was wet. (Docket # 31-11 at 4, 7). Further, the Rileys contend that their expert has opined that Marriott unreasonably permitted water to accumulate on walking surfaces at the Hotel. (*Id.* at 7). According to the Rileys, the evidence demonstrates that Marriott employees failed to remedy the dangerous condition by using floor mats and failed to warn its guests of the dangerous condition through use of cones or wet floor signs. (*Id.* at 7-9). The Rileys maintain that they do not have to demonstrate how much water had accumulated on the floor because any amount would represent a dangerous condition. (Docket # 34 at ¶ 11). In any event, the Rileys maintain that their ability to quantify the amount of water on the floor has been impeded by Marriott's destruction of the video footage. (*Id.*).

Marriott contends that the Rileys have failed to establish their entitlement to summary judgment. According to Marriott, the Rileys have not established that the condition of the floor was unreasonably dangerous, the length of time the conditions existed or that Marriott had knowledge of the conditions. (Docket # 33-5 at 6). With respect to the condition of the floor, Marriott maintains that Alejandro, who witnessed the accident, testified that the floor was "not that wet." (*Id.*). Further, according to Marriott, Burger testified that the floor was not slippery. (*Id.*). Finally, Marriott maintains that the video footage of the accident demonstrates that several individuals traversed the same area without falling. (*Id.*). Regarding the length of time that the conditions existed, Marriott contends that Burger's testimony that there was a

"downpour" moments before the accident suggests that the conditions had not existed for long. (*Id.*).  Marriott also maintains that summary judgment is inappropriate because Linda was comparatively negligent.  (*Id.* at 7).

Having reviewed the evidence submitted by both parties, I agree with Marriott that factual issues preclude summary resolution of the issue of Marriott's breach of its duty of care.  The Rileys have come forward with evidence including their testimony, Marriott employees' testimony, video footage and an expert to demonstrate a dangerous condition existed at the Hotel and that the Hotel knew or should have known of the dangerous condition.  In response, Marriott has demonstrated that factual issues exist concerning the amount of water that had accumulated on the floor, the length of time that the water had remained on the floor, and whether Marriott employees knew that water sometimes accumulated in that area during inclement weather.

I agree with the Rileys that the destroyed video footage might have assisted them in establishing the conditions of the floor, the length of time the conditions existed and whether Marriott employees had actual knowledge of them.  Yet, as I concluded above, the appropriate sanction for the destruction of the video is to permit the factfinder to infer that the destroyed footage would have supported the Rileys' version of the facts.  If the factfinder determines that such an inference is appropriate, that evidence will be weighed, along with other evidence that the factfinder determines to be credible.  Accordingly, I conclude that the destruction of the video does not warrant granting summary judgment in the Rileys' favor and that factual disputes concerning the conditions of the floor at the Hotel preclude summary resolution of this issue.

2.      **Causation**

The Rileys contend that they have established that there are no factual disputes

concerning the nature and severity of Linda's injuries and that the injuries were caused by her

fall.  (Docket # 31-11 at 10-11).  Marriott's opposition papers do not address the Rileys'

contentions on these issues.  (Docket # 33).  Although Marriott's failure to oppose this argument

does not alone warrant summary judgment, *see Levitant v. City of New York Human Res. Admin.*,

558 F. App'x 26, 30 (2d Cir. 2014), I conclude that the Rileys have established that there are no

issues of fact that her fall caused her injuries and that her injuries are permanent.

The Rileys have submitted the opinion of Medved, the independent examining

physician.  Medved opined that Linda suffered from "right peroneal neuropathy involving deep

peroneal nerve as well as superficial sensory branch" and that she had a "residual mild sensory

motor deficit in her right lower extremity with mild residual weakness in dorsiflexion of the right

foot and great toe, partial foot drop with heel walk, and sensory loss in the peroneal sensory

distribution."  (Docket # 31-10 at 12).  According to Medved, Linda's prognosis for additional

recovery was poor, and he thus opined that her injuries were permanent.  (*Id.*).  Medved

determined that Linda's condition developed after she broke her leg when she fell and that her

nerve damage correlated to the fracture in her leg.  (*Id.*).  Accordingly, Medved opined that the

fall caused Linda's injuries.  (*Id.*).

Marriott has not opposed this portion of the Rileys' motion, and nothing in the

record creates an issue fact with respect to either the nature and severity of Linda's injuries or

Medved's opinion that the fall caused those injuries.  Accordingly, I conclude that the Rileys are

entitled to summary judgment on both of those issues.  In reaching this conclusion, the Court is

not making any determination as to whether Marriott was negligent, whether that negligence was

a "substantial factor" in causing Linda to fall, or whether Linda was comparatively negligent. *Knodle*, 742 P.2d at 386 (under Hawaii law, a defendant's negligence is considered to have caused a plaintiff's injuries if the defendant's negligence was "a substantial factor in causing the plaintiff's injuries") (quoting *Mitchell v. Branch*, 363 P.2d 969, 973 (Haw. 1961)).  Those issues must be determined by the factfinder.


## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for sanctions and for summary judgment (**Docket # 31**) is **GRANTED in part and DENIED in part**.  Plaintiffs are entitled to an adverse inference instruction with respect to the destruction of relevant portions of the video recording and the sweep sheets.  Plaintiffs have demonstrated that there are no issues of fact that Linda's fall caused her injuries or as to the nature and severity of her injuries.  A **trial date status conference** will be held with the undersigned at 2310 U.S. Courthouse, 100 State Street, Rochester, New York on **December 9, 2014**, at **2:00 p.m.**

**IT IS SO ORDERED.**

*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
      September 25, 2014